**In re The M.V. "FLOREANA".**

**No. Civ.A. H–98–3283.**

United States District Court, S.D. Texas.

Feb. 12, 1999.

Pat Cooney, Houston, TX, for plaintiff.

Daniel Shilliday, Houston, TX, for Port of Houston Authority.

Robert Ryniker, Houston, TX, for Coastal Cargo.

Edward Burbach, Houston, TX, for Orion Transport.

Robert Oliver, Houston, TX, for Assoc. Petroleum, GE Packaged Power, Stewart & Stevenson, Tril Export, & Halliburton.

Stan Nelson, Houston, TX, for Dailey International, World Commerce Forward-

ing, BJ Services Int'l, Centrilift, WTS of Houston, Helmerich & Payne International Drilling Company.

Frank Billings, Houston, TX, for Saga Transport.

## Opinion on Further Security

HUGHES, District Judge.

### 1. *Introduction.*

Last summer, the M.V. *Floreana* capsized at a dock in the Port of Houston. Its salvage value is roughly $10,000. She rolled and sank as cargo was being stowed.

The *Floreana* was owned by Inmar Shipping Company. The owner has brought an action to limit its liability. Claimants have asked that the court order the owner to pay the proceeds of its hull insurance into the registry of the court as security for losses attendant on the sinking that exceed the residual value of the vessel.

### 2. *Vessel Interests.*

Inmar is a Panamanian corporation with headquarters in Ecuador. Its operations were limited to the *Floreana,* a single ship corporation. The *Floreana* flew the flag of Belize. Inmar carried hull insurance on the vessel for $1.5 million. The insurer has paid Inmar the proceeds in Ecuador, and Inmar says it has spent them.

### 3. *Further Security.*

The claims against the vessel greatly exceed its current value. Several of the claimants—charterer, stevedore, shipper—say that Inmar should be obliged to contribute the insurance proceeds to the pool available for the vessel's creditors. They make two arguments in terms of unconscionability. First, the claimants point to the large losses and the low value, making a gross disparity argument. Second, the claimants point to the ship's origins—Panama, Ecuador, and Belize—and losses in America, making a xenophobic claim.

The assertion that something is unconscionable is little more than a distaste for the particular result. Harsh results do not necessarily eviscerate otherwise sound principles. Forgetting that maritime limitation of liability is a principle of American law that parallels international law leads to idiosyncratic judgments that undermine the predictability and reciprocity of American maritime law. *See In the Matter of the Complaint of Demline Navigation Ltd., as owner of the M.V.* Josephine, 1981 A.M.C. 1465 (S.D.Ga.1981); *Petition of Marsuerte Compania Naviera, S.A., as Owner of the Steamship Tassia for Exoneration from or Limitation of Liability,* 252 F.Supp. 279 (S.D.N.Y.1966).

### 4. *Gross Disparity.*

The utility of a maritime limitation action is that it restricts recoveries against the owner when the losses from a particular voyage exceed the value of the ship. It is a bankruptcy liquidation. The claimants would have no one file for liquidation if his debts exceeded his assets.

Although the results are frequently harsh, the limitation proceeding is an ancient international practice that developed to facilitate trade. It solved a variety of dilemmas over jurisdiction of parties and conflicts of laws. Its effect of insulating owners for otherwise legitimate liabilities is parallel to corporate law as well as the bankruptcy system. *See* Lynn N. Hughes, *The Shipowners' Right to a Limitation of Liability,* 1988 LLOYD'S MAR. & COM.L.Q. 517.

### 5. *Foreigners.*

Nothing sinister can be made of the vessel's registry. Seventy-five percent of all cargo vessels clearing American ports in international trade are registered some place other than the United States. Foreign vessels transport 90% of international commercial freight clearing the United States, in and out. U.S. Coast Guard, *Origins of the Post State Control Program* (as modified Aug. 12, 1998) < http://

www.uscg.mil/hq/g-m/psc/origins.htm. >. Of nearly 27,000 vessels, fewer than 500 are American. *See* U.S. Census Bureau, STATISTICAL ABSTRACT OF THE UNITED STATES: 1998, at 666.

Perhaps registration in Belize may be fairly characterized as a flag of convenience, but there is no law of inconvenience. If America has maritime law, its rules must apply to those who seek the convenience of foreign registry. Although America has reserved its coastwise trade to vessels with her flag, it has not applied different standards of security for liability to our trading partners.

Not that it should matter, but this is not an instance of a ship owned by an American who sought somehow to avoid domestic law. Because of disincentives, "almost seventy percent of beneficially-owned U.S. tonnage is held under FoC [flags of convenience] registry." William A. Lovett, *Maritime Rivalries and the World Market, in* UNITED STATES SHIPPING POLICIES AND THE WORLD MARKET 1, 18 tbl. 1.3 (William A. Lovett ed., 1996).

This ship is owned by a corporation in Panama, operated from an office in Ecuador, insured by a company in Ecuador, and registered in Belize. The owners in Ecuador chartered it to a corporation organized in the Cayman Islands, and it—not the owner—was operating it in the United States when it capsized. Everything about the relations that made up this transaction were both international and convenient.

The nature of international trade is that people from distant, distinct countries deal with each other and that when on occasion a peril of trade by sea causes a loss, the law's mechanism adjusts the losses in one place adventitiously chosen. Flags of convenience are no more inequitable than corporate charters of convenience.

### 6. *Without Limitation.*

The possibility exists that Inmar may be liable for losses above the value of the wreck of the *Floreana* since there are many defenses to applying the law's limitation. The potential liability of the foreign corporation is unsecured. That is not inequitable; it is just as the parties contracted. The charterer did not require a bond from the owner to secure its potential liability for breaches of the owner's warranties. Now, after the fact, the charterer wants the court to alter the charter party to include a collateral pledge by the owner of its proceeds from the hull insurance.

These claimants are not fortuitous victims of a stranger's error. They chose to hire a vessel from a foreign shipowner or to supply longshoremen to its vessel while under charter to another foreigner. The shipper could have selected a domestic carrier using domestic ships with a domestic insurer, presumably at a higher freight rate, but it did not. Its course—not recourse—for its choosing to do business with distant, insubstantial companies is in bonds, deposits, pledges, and first-party insurance.

### 7. *Conclusion.*

Inmar will not need to pay its hull insurance proceeds into the registry or otherwise secure its potential liability.